315 P.3d 1247

**Mark F. WYNN, Appellant,**

v.

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY, an Agency, and Hensley and Co., Appellees.**

**No. 1 CA–UB 12–0372.**

Court of Appeals of Arizona, Division 1.

Jan. 7, 2014.

Knapp & Roberts, P.C., By David L. Abney, Scottsdale, for Appellant.

Fennemore Craig, P.C., By John J. Balitis, Jr., Janice Procter–Murphy, Carrie Pixler Ryerson, Phoenix, for Appellee Hensley and Co.

Judge MARGARET H. DOWNIE delivered the opinion of the Court, in which Presiding Judge LAWRENCE F. WINTHROP and Judge JON W. THOMPSON joined.

**OPINION**

DOWNIE, Judge.

¶ 1 Mark F. Wynn appeals from a determination by the Arizona Department of Economic Security ("ADES") that he is ineligible for unemployment benefits based on a lump

---

sum payment he received from his former employer, Hensley and Co. ("Hensley"). The question before us is whether that payment constituted severance pay that disqualified Wynn from benefits. Because we conclude that the payment included only two weeks' wages in severance pay, we vacate ADES's ineligibility decision and remand for an award of benefits.

## FACTS AND PROCEDURAL HISTORY

¶ 2 After working for Hensley for 33 years, Wynn was subject to an involuntary reduction in work force. Hensley offered Wynn the option of participating in a severance plan, which required him to sign a document titled "Severance Agreement and Release" ("Agreement"). Wynn signed the Agreement, which provided that his termination was effective November 4, 2011; that Hensley had paid "all wages and other compensation due through the Termination Date, including all accrued vacation pay;" and that Hensley would pay Wynn "severance equal to two (2) Weeks Base Pay, regardless of whether [Wynn] enters into this Release."

¶ 3 A section of the Agreement titled "Severance Payment" stated that Wynn would receive "[a] cash payment equal to $75,600.00, which is 12 Months Base Pay paid, less the usual withholding from wages, in a single lump sum within seven (7) calendar days after the Effective Date of this Release[.]" Other provisions of the Agreement provide:

- Hensley will not pay Wynn "until this Release has become effective";
- Wynn is signing the release "in order to induce [Hensley] to provide the Benefits";
- The benefits Wynn "will receive in exchange for signing this Release are in addition to anything of value to which [Wynn] is already entitled";
- "The Benefits provided for in this Release are the only consideration that [Wynn] ever will receive from [Hensley] ... for any and all claims, demands,

obligations or causes of action released in this Release[.]"

¶ 4 A significant portion of the Agreement is devoted to unilateral release terms. Wynn "fully release[d] and forever discharge[d]" Hensley "from any and all agreements, debts, claims, demands, actions, judgments, causes of action, and liabilities of every kind or nature, known or unknown, that [he], individually or as a member of a class, ever had or now has." The release bars "every claim, demand, and cause of action, including without limitation any and all claims arising under" 17 statutory schemes and various equitable and common law claims.[1] The Agreement advised Wynn to consult an attorney, gave him 45 days "to decide whether to sign this Release," and offered him an additional 7 calendar days after signing to "change his ... mind and notify [Hensley] in writing that [he] has canceled this Release." Otherwise, the release would become effective on the eighth day after Wynn signed it. If Wynn were to revoke the release after signing it, he would "not receive any Payment."

¶ 5 Wynn discussed the Agreement with his financial adviser, signed it, returned it to Hensley, and did not cancel the Agreement. He received the lump sum payment specified in the Agreement on November 16, 2011.

¶ 6 In December 2011, Wynn filed a claim for unemployment benefits. Based on the lump sum payment from Hensley, an ADES deputy deemed Wynn ineligible for benefits, citing Arizona Revised Statutes ("A.R.S.") section 23–621 and Arizona Administrative Code ("A.A.C.") R6–3–55460(B). Wynn appealed. At the ensuing Appeal Tribunal hearing, an Administrative Law Judge ("ALJ") sought to determine whether the lump sum payment was "truly a severance payment" or whether it was made in exchange for Wynn's release of claims against Hensley. In response to questions posed by the ALJ, Wynn testified he was "not interested in [law] suits or bargaining" the terms of his separation and had "no reason to ... go after" Hensley or "be upset with them."

---

1. Hensley does not contend that Wynn waived his claim for unemployment benefits by signing   the release.

¶ 7 Hensley's Vice President of Administration, Chris Yarrington, testified that the amounts offered to employees were non-negotiable and were based on years of service. He explained that employees like Wynn, with 30–plus years of service, received 1 year of base pay, while employees with less than 15 years of service received 3 months' base pay. Yarrington testified that employees who refused to sign the release would receive "two weeks base pay and whatever benefits remain[ed]" in the month of termination, and they would retain the ability to sue Hensley. To receive more than two weeks' pay, Yarrington confirmed, an employee must sign the release.

¶ 8 The ALJ concluded that Wynn received 50 weeks' base pay in consideration for signing the liability release, with only two weeks' wages constituting severance pay. Hensley petitioned for review. The ADES Appeals Board ("Board") concluded that Wynn received the $75,600 payment in "exchange for signing" the Agreement and that he would have received only two weeks' pay had he not signed the release. Without further analysis, the Board labeled the entire amount "severance pay" and ruled Wynn was ineligible for benefits.

¶ 9 Wynn requested review, but the Board affirmed its decision. Wynn timely requested review by this Court. We have jurisdiction pursuant to A.R.S. § 41–1993(B).

## DISCUSSION

■ ¶ 10 Arizona's Employment Security Act, A.R.S. §§ 23–601 to –799, ("the Act") dictates eligibility for state unemployment benefits. To qualify for benefits, an applicant must be "unemployed," as defined by the Act. *See* A.R.S. §§ 23–601, –771(A). An individual is "deemed 'unemployed' with respect to any week during which the individual performs no services and with respect to which no wages are payable to the individual." A.R.S. § 23–621(A). " 'Wages' means all remuneration for services from whatever source, including commissions, bonuses and fringe benefits...." A.R.S. § 23–622(A). Section 23–621 was amended in 2004 to prohibit an individual "receiving wages in lieu of notice, dismissal pay or severance pay" from being "deemed 'unemployed.' " A.R.S. § 23–621(C). Severance pay "may be made as a lump sum at the time of termination of services." A.A.C. R6–3–55460(A)(2).

¶ 11 Whether Hensley's payment was properly classified as severance pay is a question of law that we review *de novo*. *See Capitol Castings, Inc. v. Ariz. Dep't of Econ. Sec.*, 171 Ariz. 57, 60, 828 P.2d 781, 784 (App.1992). Our statutes do not define "severance pay," and no Arizona appellate decision has addressed the effect of an agreement for enhanced compensation that is conditioned on signing a release of liability.

¶ 12 We disagree with Hensley's contention that A.R.S. § 23–621(C) resolves the issue. That section prohibits a person "receiving wages in lieu of notice, dismissal pay or severance pay" from being "deemed 'unemployed.' " It directs that any such payments be allocated to a post-separation time period determined in one of two ways:

1. If there was a written contract between the employer and the claimant in effect at the time of separation, allocate to the appropriate period in accordance with the contract, continuing for the number of work days that the pay would cover at the regular wage rate.

2. If no written contract was in effect at the time of separation, allocate to the appropriate period following the last day of performance of services, continuing for the number of work days that the pay would cover at the regular wage rate.

A.R.S. § 23–621(C)(1), (2).

¶ 13 Section 23–621(C) dictates how to allocate severance pay, but it does not answer the threshold question of what constitutes severance pay.[2] And nothing in the Act sug-

---

**2.** We also disagree with Hensley that reference to a "written contract" in A.R.S. § 23–621(C)(1) and (2) "shows that the Legislature understood that severance payments are often made in connection with a contract, many of which will contain a release." Subsection (C)(1) applies if "a written contract between the employer and the claimant" exists at the time of separation and allocates the severance payment "to the appropriate period in accordance with the contract";

gests that *any* type of payment made to an employee at the time of separation is disqualifying remuneration.

¶ 14 Several jurisdictions have addressed whether payments are disqualifying severance pay for purposes of unemployment benefits when accompanied by employer-mandated liability releases. *See, e.g., Pero v. Indus. Claim Appeals Office,* 46 P.3d 484, 485–86 (Colo.App.2002); *Parker v. Underwriters Labs., Inc.,* 140 Idaho 517, 96 P.3d 618, 621–22 (2004); *DiCerbo v. Comm'r of the Dep't of Emp't & Training,* 54 Mass.App.Ct. 128, 763 N.E.2d 566, 569–71 (2002); *White v. Comm'r of the Dep't of Emp't & Training,* 40 Mass.App.Ct. 249, 662 N.E.2d 1048, 1050–51 (1996). These decisions articulate various factors that are relevant in determining the nature of a particular payment, which we distill as follows:

- The employer's motivation to assist the employee while searching for new employment;
- The language used in the agreement and by the parties to describe the payment;
- The breadth of the release;
- What, if anything, the employee will receive if he or she refuses to sign the agreement; and
- Whether the employee has any claims to waive.

¶ 15 In the absence of a statutory definition of severance pay, we adopt these factors as pertinent to a determination of whether a payment is disqualifying severance pay under the Act. We next apply the factors to the record developed in this case.

### A. Employer's Motivation

■ ¶ 16 The record does not demonstrate that Hensley's motivation in offering Wynn 50 weeks of pay was to assist him financially while he sought new employment. *See Pero,* 46 P.3d at 485–86 (considering testimony "that 'the biggest motivation' for the [em-

ployer's] payment was to provide 'a decent cushion' to displaced employees" in upholding finding that payment was disqualifying severance pay); *DiCerbo,* 763 N.E.2d at 567, 570–71 (fact that lump sum payment was due "regardless of whether or when the discharged employees found new employment" was relevant to determination that separation package was not disqualifying remuneration). Indeed, the terms of the Agreement reveal a different motivation.

¶ 17 The Agreement makes clear that Hensley will not pay Wynn more than two weeks' wages unless he signs the release. It states that Wynn is signing the release "knowingly and voluntarily, in order to induce" Hensley to provide the stated benefits and that Hensley's payment of benefits is "in exchange for signing this Release." Furthermore, the Agreement labels the benefits Wynn will receive as "consideration" for his release of claims, stating:

> The Benefits provided for in this Release are the only consideration that Employee ever will receive from the Company or any Released Parties (as defined below) for any and all claims, demands, obligations or causes of action released in this Release[.]

¶ 18 The Agreement establishes that the employer's motivation was to financially assist employees subject to the reduction in force, Wynn included, only to the extent of paying them two weeks' wages. This factor weighs in favor of Wynn's eligibility for benefits as to all but two weeks' pay.

### B. Language Used by the Parties

¶ 19 The section of the Agreement discussing the lump sum payment is entitled "Severance Payment." Wynn and Hensley also called the payment "severance" in claims-related paperwork and at the Appeal Tribunal hearing. The parties' chosen nomenclature, though, is not dispositive. *See Parker,* 96 P.3d at 621–22 ("self-serving language"

---

subsection (C)(2) applies when no written contract is in effect and allocates the payment "to the appropriate period following the last day of performance of services." The historical and statutory notes regarding the 2004 amendment to section 23–621 state that the allocation procedure does not apply to "severance pay paid to an

individual in accordance with an employment contract entered into before January 1, 2005." 2004 Ariz. Sess. Laws, ch. 251, § 16 (2d Reg. Sess.). Read in context, "written contract" refers to a contract of employment, not an agreement containing the terms of separation from employment.

describing payment as severance belied by fact employee would receive only two weeks' pay unless release signed (citing *Moore v. Digital Equip. Corp.*, 868 P.2d 1170, 1172 (Colo.App.1994), superseded by statute, 1996 Colo. Sess. Laws, ch. 9, § 1 (2d Reg.Sess.), as recognized in *Pero*, 46 P.3d at 485)). The terms of the Agreement are more important in discerning the true nature of the payment than colloquial references to "severance." Moreover, other provisions of the Agreement label the two weeks' base pay "severance." Despite the inclusion of that language in the "Recitals" section, Yarrington testified that this term was indeed part of the Agreement. On balance, application of this factor is neutral.

### C. Breadth of Release

¶ 20 As noted *supra*, ¶ 4, the release required Wynn to waive "every claim, demand, and cause of action, including without limitation" claims arising under 17 statutory schemes and various equitable and common law claims. The release applies to far more than wage-related claims and includes, for example, civil rights, ERISA, OSHA, ADA, FMLA, whistleblower, defamation, breach of contract, and personal injury causes of action.

¶ 21 We do not foreclose the possibility that an employer might draft a more narrow release without jeopardizing a payment's classification as severance pay.[3] But that is not the case before us. Over 25% of the Agreement is devoted to release terms that are drafted to cast the broadest possible net. Application of this factor dictates against a finding that the lump sum payment was severance pay.

### D. Benefits Available Without Release

¶ 22 We next consider what Wynn would have received had he refused to sign the release. *See Parker*, 96 P.3d at 622–23 (entitlement to enhanced benefits only with signed release was evidence that consideration for agreement was not services, but release of liability); *DiCerbo*, 763 N.E.2d at 570–71 (requirement that employees sign

agreement releasing liability to receive severance package relevant to determination that payment was not disqualifying remuneration); *White*, 662 N.E.2d at 1050–51 (fact "employee would receive nothing unless he signed the broad release of all claims" was significant factor in "remov[ing] the payment from the definition of remuneration").

¶ 23 The Board found that if Wynn had declined to sign the release, "he would only be entitled to receive two weeks of severance pay." This finding is virtually compelled by the terms of the Agreement, as well as the testimony of Hensley's vice president. The following exchange occurred at the Appeal Tribunal hearing:

ALJ: So to get the . . . additional amount beyond . . . two weeks of base pay . . . requires . . . a release that's executed according to the terms in this release?

YARRINGTON: That is correct.

ALJ: Okay. And would it be fair to say that the Employer has roughly valued the weeks beyond two weeks as—you know—a kind of mutual exchange of consideration here . . . in entering this release?

YARRINGTON: Yes. That value is based upon years of service on each release.

¶ 24 This factor is particularly weighty in a case like this one, where the employee receives only *de minimis* value if he refuses to sign a take-it-or-leave-it release drafted by the employer.

### E. Waived Claims

¶ 25 The final consideration is whether the employee indicates he or she *has* potential claims against the employer. At the Appeal Tribunal hearing, Wynn testified he had "no claims" against Hensley to release. Viewed in isolation, this testimony favors Hensley. But it is important to note that the Agreement releases Hensley not only from claims Wynn knew about, but also from all "unknown" claims and any claims Wynn may be releasing "through ignorance, oversight, error, negligence, or otherwise." This language suggests that Hensley anticipated an

---

**3.** A separation agreement could also be drafted to make clear any motivation by the employer to

assist the departing employee financially or to recognize past services.

employee might be unaware of causes of action he or she in fact possessed. Wynn's testimony therefore is not dispositive as to this factor.

¶ 26 Application of the relevant factors causes us to conclude, as did the ALJ, that the lump sum payment was severance pay only to the extent of two weeks' wages. We reject Hensley's fall-back position that if the Agreement gave rise to a "hybrid" payment (i.e., consideration for both the release of liability and severance pay), we should treat 11 months of base pay as severance and 1 month as consideration for signing the release. Hensley's proffered authority for this interpretation is section IB of the Agreement, which requires Wynn to return any payment in excess of one month's base pay if he breaches sections VII, VIII, IX or XI of the Agreement. According to Hensley, this section "essentially defines and quantifies the damage Hensley would suffer" if Wynn breached the release.

¶ 27 Generally speaking, the enumerated sections prohibit Wynn from using confidential information, retaining company property, or disparaging Hensley; they also require him to assist the employer in a smooth transition. Hensley has not alleged that Wynn breached any of these provisions. To the extent section IB could be interpreted as a liquidated damages provision, the Agreement makes clear that it applies only to breaches of sections VII, VIII, IX and XI.

### CONCLUSION

¶ 28 For the reasons stated, we vacate the determination that Hensley's $75,600 lump sum payment disqualified Wynn from unemployment benefits. We remand to ADES for an award of benefits consistent with this opinion.